# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| MARLANA M. POWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:12-CV-42-JAR |
| | ) | |
| CAROLYN COLVIN,[1] | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the Commissioner of Social Security's final decision denying Marlana Powell's ("Powell") application for disability insurance benefits and supplemental security income ("SSI") under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Powell alleges disability due to a broken leg, depression, and bipolar disorder. For the reasons set forth below, the Commissioner's decision is affirmed.

## I.    Procedural History

On March 31, 2009, Powell completed applications for disability insurance benefits and SSI. (Tr. 156-163, 164-169.) The Social Security Administration ("SSA") denied Powell's claims. (Tr. 91-99) She filed a timely request for a hearing before an administrative law judge ("ALJ"). (Tr. 103-104) The SSA granted Powell's request and the hearing took place on June 3, 2010. (Tr. 39-90, 114-120) The ALJ issued a written decision on November 3, 2010, upholding

---

[1] **Error! Main Document Only.**Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is therefore substituted for Michael J. Astrue as the Defendant in this action.

the denial of benefits.  (Tr. 23-34)  Powell requested review of the ALJ's decision by the Appeals Council.  (Tr. 16-19)  On November 18, 2011, the Appeals Council denied Powell's request for review.  (Tr. 1-6)  The decision of the ALJ thus stands as the final decision of the Commissioner.  *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).  Powell filed this appeal on January 10, 2012.  [Doc. 1].  The Commissioner filed an Answer.  [Doc. 10].  Powell filed a Brief in Support of her Complaint.  [Doc. 21].  The Commissioner filed a Brief in Support of the Answer.  [Doc. 20].  Powell filed a Reply Brief [Doc. 22].

## II.    ALJ's Decision

The ALJ determined that Powell meets the insured status requirements of the Social Security Act through December 31, 2010 and has not engaged in substantial gainful activity since March 16, 2009, the alleged onset date of disability.  (Tr. 25)  The ALJ found that Powell had the following severe impairments:  bipolar disorder, depression, status post broken left leg and ankle.  (Tr. 25)  The ALJ also found that Powell does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 29)  Then, the ALJ determined that Powell has the residual functional capacity ("RFC") to perform light work and is capable of performing her past relevant work as a housekeeper.  (Tr. 31-32)  Finally, the ALJ concluded that Powell has not been under a disability as defined in the Social Security Act, from March 16, 2009, through the date of the decision.  (Tr. 33)

Powell contends that the ALJ's determination of her mental RFC was not supported by medical evidence and therefore, is not supported by substantial evidence on the record as a whole.  Specifically, Powell contends that the ALJ improperly credited the opinions of a non-examining, non-treating physician regarding her psychological condition. The Commissioner

contends that substantial evidence on the record as a whole supports the Commissioner's decision.

## III.   Administrative Record

The following is a summary of the relevant evidence before the ALJ in this matter.

### A.   Hearing Testimony

The ALJ held a hearing in this matter on June 3, 2010.  The ALJ heard testimony from Powell; Dr. John Hickman, a medical expert; and Julie Harvey, a vocational expert.

#### 1.   Claimant's Testimony

Powell was convicted of felony stealing and possession of marijuana and prescription drugs in June 2007.  (Tr. 46)  She was paroled in June 2008 and then received a parole violation in December 2008 and returned to the Department of Corrections ("DOC") for ninety days.  (Tr. 45-46)  She was also charged with methamphetamine possession, but the charges were dropped in 2009.  (Tr. 47)  At the time of the hearing, Powell was still on parole, but had no violations or current charges pending.  (Tr. 49)  Her parole was scheduled to end in June 2012.

Powell does not currently use marijuana or methamphetamine.  (Tr. 52)  She is taking prescription medication Celexa, Xanax, Metformin, Hydrochlorothiazide ("HCTZ"), and Lorcet, as well as insulin.  (Tr. 53)  During the week prior to the hearing, Powell had a hysterectomy and a partial oophorectomy.[2]  (Tr. 54)

Pain in her knee, legs, and feet, as well as her anxiety keep her from being able to work. (Tr. 63)  Her legs swell and the bottom of her feet hurt when her legs swell.  *Id.*  Her feet begin to swell after standing for about 30 minutes.  (Tr. 65)  Her feet swell after two hours while sitting, if she does not prop her feet up.  (Tr. 65)  Powell fractured her ankle in March 2009.  (Tr.

---

[2] Oophorectomy, also known as, ovariectomy is "the excision of one or both ovaries."  Stedman's Medical Dictionary 1263, 1289 (27th ed. 2000).

73) She puts her feet up every two hours to help reduce swelling in her ankles. (Tr. 74) Her feet remain elevated for thirty minutes to an hour. (Tr. 74) She is also being treated with insulin for her diabetes. (Tr. 63) Her blood sugar has decreased since starting the insulin, but she feels nauseated sometimes. (Tr. 63-64) She is following the diet given to her pretty closely. (Tr. 64)

Since March 2009, she has been unable to get up and get dressed about two to three days out of the week. (Tr. 68) She is unable to get out of bed, because she just feels sad and worthless. (Tr. 69) She told Dr. Mason about her problems with getting out of bed and that she does not think some of the medicine she was given in prison, Ramrod[3] and Celexa, was working. *Id.* She was diagnosed with sleep apnea, because she stopped breathing nine times in an hour. *Id.* She currently takes 40 milligrams of Celexa. *Id.* She is receiving a continuous positive airway pressure ("CPAP") machine the day after the hearing for her sleep apnea. (Tr. 71)

Powell has problems with people anxiety and test anxiety. (Tr. 70) She is not currently receiving psychological or psychiatric help. (Tr. 74) When she is around people, she becomes shy, backs off, and starts panicking. (Tr. 71) When she panics, she has to be alone for about a half-hour. *Id.* Powell also suffers from insomnia, which keeps her up very late about five times per week. *Id.* When she has insomnia, she only receives four to five hours of sleep. *Id.* The next day, she is tired, drowsy, cranky, and has anxiety. (Tr. 73) Sometimes, the insomnia, will cause her to fall asleep during the day time. *Id.*

Sometimes, Powell hears voices. (Tr. 75) The voices make it hard to concentrate if she is trying to take a test or listen to her teacher's lecture. *Id.* She also has nightmares about twice a week. (Tr. 75-76) The nightmares are flashbacks, but she also has nightmares that she cannot

---

[3] Based in context of the evidence in the record as a whole, the court believes that Powell was referencing the medication Remeron rather than "Ramrod" as transcribed.

remember, but cause her to wake up panicky. (Tr. 76) It is hard to go back to sleep after the nightmares. *Id.*

Powell attended school at East Central Community College. (Tr. 65) She did not attend school this summer, because she had gone to school three semesters in a row. (Tr. 64-65.) She is in her fourth semester and has a 1.75 grade point average on a 4.0 scale. (Tr. 65) She took communications and barely passed, because she got bad grades based on her presentations. (Tr. 66) When she gets up in front of the class, she is nervous and jittery. *Id.* She has to ask for extra time on her written examinations and she fails them almost every time if the tests are online. *Id.* She doesn't know why she fails the online exams, but she may get test anxiety. *Id.*

She is going to relax during the summer, but she is going to study math, because she will have to take an introduction to algebra class for the third time. (Tr. 67) She does not have anything fun planned during the summer, but she has grandchildren on the way. *Id.* If the ALJ came to her house for fun, they would probably play the card game Rummy 10,000. (Tr. 67-68)

## 2.    Dr. Hickman's Testimony as a Medical Expert[4]

Dr. John Hickman found the medical records fairly extensive and conflicting. (Tr. 56) The records of Dr. Mary Mason, Powell's primary care physician, primarily document Powell's medical difficulties, including insomnia, obesity, high blood pressure, Ritalin[5] insufficiency, headaches, dermatitis, metabolic syndrome, and back, ankle, and knee pain. *Id.* Powell had a history of methamphetamine use until 2007. *Id.* Powell has some social anxiety and a possible history of sleep apnea. (Tr. 56) Her medications were Hydrocodone, heart medication, and Celexa. *Id.*

---

[4] It should be noted that Dr. Hickman gave lengthy testimony without any questioning lasting several pages in the transcript. There were several portions of the transcript designated as inaudible by the transcriber. The summary is the Court's best attempt to capture Dr. Hickman's testimony.

[5] Based on context of the evidence in the record as a whole, the court believes that Dr. Hickman was referencing Powell's "renal" insufficiency rather than a "Ritalin" insufficiency as transcribed.

Dr. Hickman also testified that Dr. Keith Fredrick or maybe a psychologist gave Powell moderate ratings for understanding and carrying out detailed information, working with co-workers, interacting with the public. (Tr. 56) There was nothing in the "active state of living where it's thought to be moderately impacted or limited as were social functioning, attention, concentration, and memory." (Tr. 56-57) Previous testing showed that Powell's IQ values were in the average range. (Tr. 57) She had a Global Assessment Functioning[6] ("GAF") score of 60 at that time, but she also had an earlier one at 50 or 55. *Id.* There is evidence of previous psychiatric difficulties in the psychological evaluation by Dr. Thomas Spencer. *Id.*

Powell received a bipolar diagnosis in 2007. (Tr. 57) She was treated for hearing some voices during her time in prison. *Id.* It was noted that Powell had poor attention and concentration and problems with anger control. *Id.* It is questionable whether it was secondary to her use of methamphetamine. *Id.* Powell has described feeling manic episodes for long periods of time while using methamphetamine. *Id.* During adolescence, she was hospitalized for depression. *Id.*

Powell's school records showed marked difficulties with attention and concentration; completing her work, getting along with peers and being easily distracted in class. (Tr. 57) Powell received her general education diploma ("GED"). *Id.* Powell was physically and emotionally abused by her father. *Id.* Her vocational functioning was limited to housekeeping, fast food, and home health. *Id.* The longest jobs she had held lasted two years in duration. (Tr. 58)

---

[6] Global Assessment Functioning Scale is the report of the clinician's judgment of the individual's overall level of functioning in the areas of psychological, social, and occupational functioning located at Axis V of the DSM-IV mutliaxial classification system. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders IV Text Revision 32 (4th ed. 2000).

She had legal problems. She had charges for stealing, possession of controlled substances, and manufacturing methamphetamines. (Tr. 58) Dr. Spencer gave Powell a GAF of 50 to 55 for major depressive disorder, recurrent, as well as meth dependency. *Id.* Most of her school records were from the 7th grade, so she was probably 14 years old. *Id.* Powell may have had ADHD at that time. *Id.* She may have had bipolar at that time, too or both. (Tr. 58) Powell experienced her sister's suicide when she was quite young. (Tr. 58) There were reports of a lot of drug abuse in her family and probably a presence of psychiatric disorders in her family. *Id.*

Dr. Hickman stated that Powell's situation is confusing. (Tr. 58) She obviously had major difficulties growing up, including trouble in school and functionally; then she was taking meth rather heavily for a number of years, is imprisoned, gets out, and begins seeing Dr. Mason. *Id.* According to Dr. Mason's report, "she's kind of functioning better than she ever has." *Id.* Dr. Hickman suggested that perhaps Powell is on the right medications or the toxic brain altering effects of meth have been cleared from her brain, at least partially, although the most recent research shows that cellular changes from chronic meth use never go away in the brain. (Tr. 59) He stated Powell "is functioning now better than she ever has in the past." *Id.* "The type of readings [sic] she is giving in her present functioning don't really meet any criteria for mental disability, although she would be rated under 12.04." *Id.* Dr. Hickman stated that considering Powell's medical problems, including pain issues, difficulty with knees and ankles, she might be able to [inaudible] those listings, but it is "not real clear [to him] at this time." *Id.*

It was Dr. Hickman's understanding that Powell has always had bipolar disorder and she may have had ADD or ADHD at the same time. (Tr. 59) They often coexist. *Id.* At that time, Powell's symptoms were diagnosed as major depressive disorder. (Tr. 59-60) "Psychiatry has made rapid changes because of the advances in the neurosciences and that would not be a

diagnosis of bipolar disorder probably from the very beginning." (Tr. 60.) Dr. Hickman explained that bipolar disorder is the result of an over activation of the brain resulting in swings in functioning. *Id.* The addition of stimulants to the picture, such as meth, "makes everything worse." *Id.* Excessive stimulation of the brain can cause an anxiety disorder secondary to meth use. (Tr. 60) According to Dr. Hickman, the question is whether Powell has bipolar disorder and if so, whether it is meth induced. *Id.* "When you look at the early child[hood] information you see that the bipolar disorder was present in childhood and it was interfering with her social and academic functioning in school." (Tr. 60-61)

Upon questioning by Powell's attorney, Dr. Hickman acknowledged that if she has been drug-free since her date of onset of disability, one could conclude that her present symptoms of depression and anxiety were not dependent on the use or abuse of illegal substances. (Tr. 61) Dr. Hickman reiterated, however, that the research shows one never recovers from the use of illegal substances; the changes are permanent. (Tr. 62)

### 3. Testimony of Vocational Expert Julie Harvey

Powell's past work, with skill and exertion level, and specific vocational preparation[7] ("SVP") time is as follows:

| Job Title | DOT number | Exertion Level | Skill Level | SVP |
|---|---|---|---|---|
| Janitor | 381.687-014 | Heavy | Unskilled | 2 |
| Nurse Aid & Caregiver | 355.674-014 | Medium | Semi-skilled | 4 |
| Retail cashier | 211.462-014 | Light | Semi-skilled | 3 |
| Fast food cashier | 311.472-010 | Light | Unskilled | 2 |

---

[7] Specific vocational preparation is how long it generally takes to learn a job. *See Fines v. Apfel*, 149 F.3d 893, 895 (8th Cir. 1998).

| Job Title | DOT number | Exertion Level | Skill Level | SVP |
|-----------|-----------|----------------|-------------|-----|
| Home housekeeper | 323.687-014 | Light | Unskilled | 2 |
| Retail store manager | 185.167-046 | Light | Skilled | 7 |

(Tr. 78.)  Powell has transferrable skills from her past work.  (Tr. 79)

A hypothetical person of Powell's age, education, and work experience[8] who could work at a light exertional capacity; occasionally climb stairs or ramps, but never climb ladders; occasionally balance and crouch; has moderate limitations on the ability to understand, remember and carry out detailed instructions, work in coordination with or in the proximity of others without being distracted, and interact appropriately with the general public could only perform Powell's past work as a home housekeeper. *Id.* If a sit-stand option at the person's workstation were added, then the hypothetical individual would not be able to perform the home housekeeper position.  (Tr. 80)  A marked limitation on interaction with the public would not preclude the hypothetical individual from the home housekeeper position.  (Tr. 83)

A younger person who has worked hard, earned a GED, with transferrable skills[9] would be able to perform other work.  (Tr. 80)  The younger person could transfer her skills to an order filler position, DOT Code 222.487-014, which is light semi-skilled work with an SVP of 3.  *Id.* There are 18,600 order filler jobs in Missouri and 1,057,000 in the national economy.  (Tr. 80)  The other jobs that are transferrable would require too much public contact.  *Id.*

---

[8] The court assumes that the ALJ was seeking information about a hypothetical person of Powell's age, education, and work experience, even though it was not stated as such to the VE.
[9] Neither the ALJ nor the VE identify the transferrable skills.

At the sedentary level, the younger person could perform work as a diet clerk, DOT Code 245.587-010, which has an SVP of 3. (Tr. 82) There are 3,000 diet clerk positions in Missouri and 111,400 nationwide. *Id.* At the unskilled level, the younger person could perform the job of a collator operator, DOT Code 208.685-010, which is light work with an SVP of 2. (Tr. 83) There are 1,100 collator operator jobs in Missouri and 118,200 in the national economy. *Id.* The younger person could also perform the job of merchandise marker, DOT Code 209.587-034, which is light work with an SVP of 2. *Id.* There are 27,200 merchandise marker jobs in Missouri and 1,548,000 in the national economy. *Id.* Finally, the younger person could perform work as a silver wrapper, DOT Code 318.687-018, which is light work with an SVP of 2. *Id.* There are 8,600 silver wrapper jobs in Missouri and 436,300 in the national economy. *Id.*

A marked limitation on interaction with the public would not preclude work in the order filler, diet clerk, collator operator, merchandise marker, or silver wrapper positions. (Tr. 83-84) If a person needs additional or prolonged breaks, that would preclude work. (Tr. 84) If a person had to elevate his or her legs under a desk for 30 minutes at a time at the workstation, the person would not be able to perform the job of order filler. *Id.* The collator operator and merchandise marker jobs would be acceptable if the merchandise was within arm's reach. *Id.* The person would be able to perform the silver wrapper job. *Id.* A person whose interference with concentration, persistence, and pace occurs at twenty percent production, cumulative would not be able to maintain employment. (Tr. 84-85) A person would not be able to maintain employment at the jobs listed previously if the person was absent from the worksite one day a week. (Tr. 85) A GAF of 50 would definitely impact a person's ability to function socially and in a work setting if it hovers around that for any length of time. (Tr. 87)

## B. Medical Records

The relevant medical records are summarized as follows.

Powell's secondary school records show that she received special education services at school. (Tr. 280) In 1988, she was classified as learning disabled in the area of reading and behavioral disabled. (Tr. 280) IQ testing showed a full scale IQ score of 89, classified as Low Average, with verbal IQ of 92 and performance IQ of 87. (Tr. 282) In 1991, her full IQ score was 87, classified as Low Average, with verbal IQ of 88 and performance IQ of 87. (Tr. 288)

Powell received mental and physical health treatment while incarcerated at the Missouri DOC between June 2007 and March 2009. (Tr. 303-385) Her physical treatment notes were unremarkable. (Tr. 313-385) She received routine medical care for such common ailments as acne, earaches, athlete's foot, and headaches, as well as dental surgery for removal of teeth. *Id.*

On April 4, 2008, Powell saw a mental health therapist and reported she was experiencing extreme highs and lows accompanied by depression, anxiety, and racing thoughts. (Tr. 304) She also reported a history of mood swings, spending a large amount of money without considering the consequences, and feeling "untouchable." *Id.* The therapist opined that Powell exhibited classic symptoms of bipolar disorder and referred her to the psychiatrist. *Id.* After a mental examination by the psychiatrist, she was diagnosed with depressive disorder not otherwise specified, amphetamine dependence, and psychotic disorder not otherwise specified. (Tr. 306) She was prescribed Remeron, and Mirtazapine. *Id.* On May 8, 2008, she received the same diagnosis. (Tr. 306-307) Powell reported being upset that she had not been approved for early release. (Tr. 306) It was noted that her mood was angry and her insight was poor. (Tr. 307)

After her return to prison in 2009, Powell reported she was constantly hearing boy and girl voices arguing between themselves. (Tr. 309) Powell also reported daily headaches, which

provided relief from the voices when the headaches are bad. (Tr. 309) She reported she could not read, focus, sleep, or concentrate due to the voices. *Id.* Powell requested medication for the voices. *Id.* The therapist found Powell's mental status appeared within normal limits, except for limited insight. *Id.* The therapist indicated that Powell seemed truthful about her concerns regarding the voices and referred Powell to the psychiatrist. *Id.* On February 13, 2009, the psychiatrist diagnosed Powell with depression not otherwise specified and meth abuse. (Tr. 310.) Her GAF was assessed at 60. *Id.*

On March 16, 2009, Powell was admitted to the Phelps County Regional Medical Center after she slipped while stepping out of the shower. (Tr. 391) The doctors determined she had a trimalleolar fracture of her right ankle. *Id.* Powell had surgery on her ankle on March 17, 2009 and was released from the hospital on March 20, 2009. *Id*. On March 22, 2009, Powell went to the Phelps County Regional Medical Center's emergency room complaining of leg pain. (Tr. 386-408) Between March 2009 and September 2009, Powell visited Dr. Keith Frederick for follow-up treatment regarding her ankle injury. (Tr. 436-443) At the end of six months of follow-up, Powell's left ankle was "well healed with no sign of infection." (Tr. 436) Powell was able to walk without a crutch, cane, or walker in August of 2009 and Dr. Frederick advised that Powell could return to her normal activities of daily living. (Tr. 438)

On April 30, 2009, Dr. Thomas Spencer completed a Psychological Evaluation to assist in a determination of Powell's eligibility for Medicaid. (Tr. 409-413) Powell reported the following to Dr. Spencer. She has bipolar disorder and depression and broke her leg. (Tr. 409) She hears male and female voices, although she last heard them two days prior to the evaluation. *Id.* The voices whisper and she cannot understand what they are saying, but they have never instructed her to harm herself or been derogatory *Id.* She typically hears the voices when she is

angry, depressed, or upset. *Id.* Powell shared that when she was five, her sixteen year old sister committed suicide, and while she did not witness the suicide, she remembers lots of blood. *Id.* She denied any past or present thoughts or attempts of suicide. *Id.* She feels hopeless, helpless, and worthless. *Id.* She has no interest in anything and has lost her libido as well. *Id.* She wakes up exhausted with no energy or motivation. She often awakes during the night due to nightmares. (Tr. 409) Her attention and concentration are poor. *Id.* She spends most of her days at home listening to the radio and lying in bed. (Tr. 411)

Dr. Spencer determined that Powell had moderate to severe, recurrent major depressive disorder, methamphetamine dependence, and bipolar disorder. (Tr. 412) He assessed her GAF at 50 to 55. (Tr. 413) Dr. Spencer concluded that Powell has a mental illness, which interferes with her ability to engage in employment suitable for her age, training, experience, and/or education. *Id*. He also concluded that the duration of her disability could exceed 12 months, although with appropriate treatment, compliance, and continued sobriety, her prognosis likely improves. (Tr. 413)

On July 7, 2009, Dr. Charles Kenneth Bowles prepared a Psychiatric Review Technique regarding Powell based upon his review of her mental health records. (Tr. 414-425.) Dr. Bowles found there was insufficient evidence to substantiate her history and diagnosis of psychotic disorder with GAFs of 60. (Tr. 416) He determined that Powell had depressive syndrome characterized by anhedonia[10], sleep disturbance, decreased energy, feelings of guilt or worthlessness, or hallucinations. (Tr. 416) Dr. Bowles also determined that Powell was moderately limited in restrictions in activities of daily living ("ADL"); maintaining social functioning; and maintaining concentration, persistence, or pace. (Tr. 422) Dr. Bowles found

---

[10] Anhedonia is the "absence of pleasure from the performance of acts that would ordinarily be pleasurable." Stedman's Medical Dictionary 88 (27th ed. 2000).

Powell's and her mother's descriptions of her ADL's only partially credible as they were not supported by objective evidence in the file. (Tr. 424) Dr. Bowles concluded that the magnitude of Powell's alleged symptoms were not supported by the clinical findings on presentation at repeated examinations, but that her condition was more than non-severe. (Tr. 425)

Dr. Bowles then completed a Mental RFC for Powell. He determined that she had moderate limitations in the ability to (1) understand and remember detailed instructions; (2) carry out detailed instructions, work in coordination with or proximity to others without being distracted by them; and (3) interact appropriately with the general public. (Tr. 426-427) He concluded that Powell appears to have the ability to understand, remember, and carry out at least simple tasks; adapt to changes in a non-complex workplace; make simple work-related decisions, socially interact with limited public contact without unusually close or demanding social interaction with authority figures and co-workers. (Tr. 428)

Jennifer Dunlap completed a Physical RFC for Powell. (Tr. 429-435) Ms. Dunlap determined that Powell did not have any manipulative, visual, or environmental limitations. (Tr. 432-433.) Ms. Dunlap found that Powell had exertional limitations of occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; standing, walking, and sitting with normal breaks for six hours in an eight hour workday; and limited to occasionally pushing or pulling with her lower leg extremities. (Tr. 430-431) She also found Powell had the postural limitations of never balancing and only occasionally climbing ramps, stairs, ladders, ropes, and scaffolds. (Tr. 432) The RFC was determined by assessment of ways to avoid aggravation or further injury due to Powell's prior fractured ankle and in consideration of evidence of obesity. (Tr. 434) Ms. Dunlap concluded that Powell had a medically determinable impairment that reasonably results in limitations, but is capable of performing as outlined in the RFC. (Tr. 434)

Powell visited Dr. Mary Mason, her primary care physician, several times between August 2009 and September 2010. (Tr. 444-462, 506-551) In August 2009, Powell reported that she had back pain and fatigue. (Tr. 444) A physical examination was unremarkable with the exception of shortness of breath and knee pain. (Tr. 445) Dr. Mason diagnosed Powell with hypertension, malaise[11], fatigue, left ankle and low back pain, and edema[12]. (Tr. 446) Dr. Mason prescribed HCTZ and recommended that Powell swim for exercise. *Id.* In September 2009, Powell reported worsening of pain in her back legs and tingling in her legs when she lay down at night. (Tr. 454) Dr. Mason noted that Powell had swollen hands. Id. Dr. Mason diagnosed Powell with edema, hypertension, and renal insufficiency. *Id.*

In November 2009, Dr. Mason diagnosed Powell with edema, pain in ankle joint, depression, obesity, and insomnia. (Tr. 459-460) Dr. Mason recommended Powell limit calories to 1500 per day, increase walking for exercise, and take a trial of Restoril for her insomnia. (Tr. 460.)

On December 30, 2009, Powell visited Dr. Mason with complaints of fatigue, severe anxiety, weight gain, and insomnia. (Tr. 466) Dr. Mason diagnosed Powell with sleep apnea, depression, and generalized anxiety disorder. (Tr. 467) Dr. Mason referred Powell for a sleep study, increased dosage of Citalopram and added Xanax. *Id.* Powell visited Dr. Mason on February 2, 2010. (Tr. 471-476) Powell reported poor sleeping and that she had bumps on her scalp. (Tr. 471) Dr. Mason diagnosed Powell with hypertension, dermatitis, cyst, obesity, headache, generalized anxiety disorder, pain in ankle joint and endema. (Tr. 472)

---

[11] Malaise is "a feeling of general discomfort or uneasiness, an 'out-of-sorts' feeling, often the first indication of an infection or other disease." Stedman's Medical Dictionary 1056 (27th ed. 2000).
[12] Edema is "an accumulation of an excessive amount of watery fluid in cells or intercellular tissues." Stedman's Medical Dictionary 567 (27th ed. 2000).

In April 2010, Dr. Mason completed a form for Powell to provide to her school in support of her request for special testing accommodations. (Tr. 508-509) Powell reported that she had a history of test anxiety, had not felt well lately, and had headaches. (Tr. 509) Dr. Mason diagnosed Powell with generalized anxiety disorder, depression, hyperglycemia, and renal insufficiency. *Id.* Dr. Mason instructed Powell to continue her current medication, but only take Xanax when needed, not regularly. *Id.* On June 1, 2010, Powell visited Dr. Mason for a checkup and reported ear pain, abdominal pain due to hysterectomy, and back pain. (Tr. 518) Dr. Mason diagnosed Powell with pain in her ankle joint, generalized anxiety disorder, status post abdominal hysterectomy and increased her Lorcet medication. (Tr. 519) On June 7, 2010 Powell returned to Dr. Mason complaining of yellow drainage on her bandages. (Tr. 523) Dr. Mason concluded that Powell had an infected surgical wound and hypertension. (Tr. 525) Dr. Mason instructed Powell to wash the area with antibacterial soap and water and use antibiotic ointment. *Id.* On June 15, 2010, Powell returned for a checkup and reported continued green and yellow drainage from the lower end of the abdominal incision with an odor. (Tr. 530) Dr. Mason diagnosed Powell with diabetes, hypertension, status post abdominal hysterectomy, and pain in ankle joint. (Tr. 531)

On July 7, 2010, Powell visited Dr. Mason and reported that she had been feeling "pretty good," but had pain in her feet, legs, and lower back. (Tr. 537) Powell also reported that she had been more active by packing her house for a move, but was frustrated by her recent weight gain. *Id.* Dr. Mason diagnosed Powell with pain in her ankle joint and did not make any changes to her medication. (Tr. 538) On November 15, 2010, Powell visited Dr. Mason for a checkup and refill on her medications. (Tr. 543) Dr. Mason diagnosed Powell with pain in ankle joint, diabetes, hypertension, renal insufficiency, irritable bowel syndrome, and history of

colonic polyps. (Tr. 543-544) Dr. Mason gave Powell a referral to general surgery for the irritable bowel syndrome and colonic polyps. (Tr. 544)

At each of Powell's visits with Dr. Mason, she noted Powell's mood and affect, behavior, and judgment and thought content were normal. (Tr. 446, 454, 459, 467, 472, 478, 483, 509, 519, 524, 531, 538, 543) Dr. Mason noted several times that Powell had a normal gait and posture. (Tr. 454, 459, 467, 472, 478, 483, 509, 538) Dr. Mason also noted that Powell had tenderness in her lumbar back and tenderness and decreased range of motion in her left ankle during visits between June and September 2010. (Tr. 519, 530, 543)

In February 2010, Powell participated in a sleep study for her insomnia. (Tr. 489-493) Dr. J.H. Brabson conducted the sleep study and concluded that Powell had mild sleep disordered breathing, which improved with the use of a CPAP machine with a humidifier attached. (Tr. 493) On May 24, 2010, Powell underwent a total abdominal hysterectomy and oophorectomy. (Tr. 502-503)

## IV.    LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920(a), 404.1520(a). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). First, the claimant must not be engaged in "substantial gainful activity." 20 C.F.R. §§ 416.920(a), 404.1520(a). Second, the claimant must have a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). Third, the claimant must establish that his or her impairment meets or equals an impairment listed in the

Regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d). Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). At step five, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work. 20 C.F.R. §§ 416.920(a)(4)(v). At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005). If the claimant satisfies all of the criteria under the five-step evaluation, the ALJ will find the claimant to be disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 404.1520(a)(4)(v). "The ultimate burden of persuasion to prove disability, however, remains with the claimant." *Meyerpeter v. Astrue*, 2012 WL 4763410, at * 7 (E.D. Mo. Oct. 5, 2012) (citations omitted).

It is the ALJ's function to resolve conflicts among opinions of various physicians and reject conclusions of any medical expert if they are inconsistent with the record as a whole. *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). Subjective complaints of a disability benefits claimant may be discounted if there are inconsistencies in the evidence as a whole. *Guillams v. Barnhart,* 393 F.3d 798, 801 (8th Cir. 2005).

It is not the job of the district court to reweigh the evidence or review the factual record de novo. *Id*. This court reviews decisions of the ALJ to determine whether the decision is supported by substantial evidence in the record as a whole. *Smith v. Shalala,* 31 F.3d 715, 717 (8th Cir. 1994). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find adequate support for the ALJ's decision. *Id. See also Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988) ("The concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it

embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.") Therefore, even if a court finds there is a preponderance of evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Clark v. Heckler*, 733 F.2d 65, 68 (8th Cir. 1984). The reviewing court may not reverse merely because substantial evidence exists for the opposite decision. *Gwathney v. Chater,* 104 F.3d 1043, 1045 (8th Cir. 1997).

To determine whether the ALJ's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

    (1) The findings of credibility made by the ALJ;

    (2) The education, background, work history, and age of the claimant;

    (3) The medical evidence given by the claimant's treating physicians;

    (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

    (5) The corroboration by third parties of the claimant's physical impairment;

    (6) The testimony of vocational experts based upon prior hypothetical questions which fairly set forth the claimant's physical impairment; and

    (7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

## V.     Discussion

On appeal, Powell alleges the ALJ's RFC determination was not supported by medical evidence and thus not supported by substantial evidence on the record as a whole. Specifically, Powell contends the ALJ improperly credited the opinions of a non-examining, non-treating physician, Dr. C. Kenneth Bowles. In response, the Commissioner maintains that the ALJ properly evaluated Powell's subjective complaints in determining her mental RFC and properly determined that Powell could perform past relevant work and other work.

RFC is defined as what the claimant can do despite his or her limitations, and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545. The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.[1] SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *See Lauer*, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *See Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

Powell argues that her allegation of disability is supported by the opinion of Dr. Thomas Spencer, who examined her at the request of the Crawford County Department of Social Services for a Medicaid eligibility determination. It was Dr. Spencer's opinion that Powell has a mental illness that interferes with her ability to engage in employment suitable for her age, training, experience, and/or education, although that prognosis would likely improve with appropriate treatment, compliance and continued sobriety. (Tr. 413) Here, the ALJ considered Dr. Spencer's evaluation and found his conclusion was not persuasive given the overall evidence in the matter. (Tr. 32) The ALJ agreed with the findings of the non-examining state agency medical expert, Dr.

---

[1]A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. SSR 96-8p, 1996 WL 374184, at *1.

Bowles and reiterated that the ultimate opinion as to a claimant's ability to work is an issue reserved to the Commissioner. (Tr. 32)

Upon review of Powell's medical records, Dr. Bowles concluded that the magnitude of Powell's alleged symptoms were not supported by the clinical findings on presentation at repeated examinations. (Tr. 425) Powell's GAFs were repeatedly in the range for only moderate impairments. There had been no evidence of any mental problems on follow up examinations for physical conditions. Powell was working full-time until going to prison for manufacturing methamphetamine. She was currently on parole and said she was no longer using drugs or alcohol. Dr. Bowles concluded that Powell's condition was more than "non-severe," rating her functional limitation as "moderate." (Tr. 422)

The ALJ also considered the testimony of medical expert Dr. John Hickman. Dr. Hickman testified that he relied on the treatment records of Powell's primary care physician, Dr. Mary Mason, which showed Powell had a psychiatric history of average IQ and some cognitive problems (Tr. 57), as well as insomnia, obesity, high blood pressure, back, ankle and knee pain. (Tr. 56) While the state agency consultant assessed a moderate limitation of Powell's abilities, Dr. Hickman stated there was nothing in the records to support this. (Tr. 56-57, 59) Dr. Hickman also questioned whether Powell's reported symptoms of poor attention and concentration were secondary to her methamphetamine use. (Tr. 57) Finally, Dr. Hickman testified that according to Dr. Mason, Powell was functioning "better than she ever has." (Tr. 58-59)

"It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Wagner*, 499 F.3d at 848. The

question of whether a claimant is disabled is reserved to the Commissioner, not to a physician. See 20 C.F.R. § 404.1503. Moreover, a physician's conclusory statement of disability without supporting evidence does not overcome substantial medical evidence supporting the Commissioner's decision. *See Loving v. Dept. of Health & Human Services*, 16 F.3d 967, 971 (8th Cir. 1994); *Browning v. Sullivan*, 958 F.2d 817, 823 (8th Cir. 1992).

Here, the ALJ properly weighed and considered the opinions and findings of Dr. Spencer and the state agency physicians. The ALJ found Powell's allegations of disabling symptoms were not entirely credible based on consideration of the entire record. In particular, the records of Powell's treating physician, Dr. Mason, indicate that Powell's mood and affect, behavior, judgment and thought content were normal and that she was functioning better than she ever had. On review, the issue is not whether the claimant actually experiences the subjective complaints alleged, but whether those symptoms are credible to the extent they prevent him from performing substantial gainful activity. *See Baker v. Apfel*, 159 F.3d 1140, 1145 (8th Cir. 1998); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998). The record contains substantial evidence that Powell's mental impairments did not markedly restrict her activities of daily living or social functioning. She has only a moderate limitation on her ability to understand, remember and carry out detailed instructions. She is able to work in coordination with or proximity to others without being distracted by others, and to interact appropriately with the general public. She retains the ability to understand, remember, and carry out simple tasks. She is able to adapt to changes in a non-complex work place and to make simple work-related decisions. She is able to interact socially with limited public contact, and no unusually close or demanding social interaction with authority figures and co-workers. Based on the foregoing, the Court finds there is substantial evidence to support the ALJ's residual functional capacity assessment.

**VI.     Conclusion**

The Court finds the ALJ's decision is supported by substantial evidence contained in the record as a whole, and, therefore, the Commissioner's decision should be affirmed.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff seeks in her Complaint [1] and Brief in Support of Complaint [16] is **DENIED**.

A separate judgment will accompany this Memorandum and Order.

Dated this 29th day of March, 2013.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE